27 F.3d 567
 146 L.R.R.M. (BNA) 2896
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
OKLAHOMA INSTALLATION COMPANY, Respondent.
 No. 93-5339.
 United States Court of Appeals, Sixth Circuit.
 June 14, 1994.
 
 Before: MARTIN, SUHRHEINRICH, and SILER, Circuit Judges.
 PER CURIAM.
 
 
 1
 In this action under 29 U.S.C. Sec. 160(e), the National Labor Relations Board ("Board") seeks a judgment enforcing its decision and order against the Oklahoma Installation Company ("Company") for violations of Secs. 8(a)(1) and 8(a)(3) (29 U.S.C. Sec. 158(a)(1) & (3)) of the National Labor Relations Act. See Oklahoma Installation Co., 309 N.L.R.B. 119 (1992). For the reasons stated below, the Board's petition for enforcement is DENIED.
 
 I.
 
 2
 The following chronology is a condensed version of the facts, taken from the administrative law judge's decision, as adopted by the Board, and the record. The Company is an Oklahoma corporation which installs fixtures and does interior millwork. Jack Boler, the Company's president, assigns each individual project to a superintendent, who in turn is responsible for all the hiring decisions on that particular project. From roughly June of 1990 through January of 1991, the Company worked at various jobsites in Davidson County, Tennessee. The work consisted of the remodeling and enlarging of an existing Dillard's department store (the "Green Hills" site) and the furnishing of a new facility (the "Hickory Hollow" site). Superintendent Darwin McBrayer handled the Green Hills project. Klint Traylor supervised the Hickory Hollow job, which commenced shortly after the Green Hills project had concluded.
 
 
 3
 Between August 20, 1990 and September 9, 1990, Carpenters Local Union No. 223 ("Union") picketed the Green Hills jobsite with signs declaring that the Company did not pay wages and benefits equivalent to those paid by employers with whom the Union had agreements. During the picketing, Green Hills carpenters James Burgess, then Local 223 president, and Michael Stewart, then the Union's recording secretary, attempted to get other company carpenters to sign union authorization cards. Carpenter Roger Davis assisted them. The union members passed out the cards in the presence of Green Hills superintendent Darwin McBrayer and foreman Leonard Taylor.[1] On September 6, 1990, the Union filed a petition with the Board seeking representation in a unit of the Company's carpenters employed in Davidson and two adjoining counties. The Union also distributed Union T-shirts and hats to the carpenters at the Green Hills site.
 
 
 4
 Four employees were permanently laid off on October 12, 1990. The Company laid off the remainder of the carpenters on November 21, 1990, upon substantial completion of the project.
 
 
 5
 On October 18, 1990, the Board's regional director issued a Decision and Direction of Election which found appropriate a unit of carpenters, apprentice carpenters, and carpenters' helpers employed by the Company in Davidson, Williamson, and Wilson counties. The representation election was held on November 15, 1990.[2]
 
 
 6
 The Company began hiring its first nonsupervisory carpenters for the Hickory Hollow job on November 25, 1990, and continued hiring until at least January 24, 1991. Traylor hired twelve former Green Hills employees. Not included in that count were eight Green Hills carpenters who were also open Union supporters.
 
 
 7
 The Board, with some modifications to the administrative law judge's findings, held that the Company had violated Sec. 8(a)(1) when: (1) Green Hills foreman Leonard Taylor told employee Davis, in early July 1990, that the Company was discriminating against union members in hiring employees for the Green Hills jobsite; (2) Green Hills superintendent Darwin McBrayer told Burgess on November 12, 1990, that Burgess' union activity and his distribution of Union T-shirts and hats would hurt "union guys, sympathizers"; and (3) foreman Taylor told employee Stewart on October 10, 1990, not to pass out T-shirts and hats on "company time." The Board also held that the Company had violated Secs. 8(a)(3) and (1) by: (1) laying off employees Burgess and Smith on October 10, 1990; (2) laying off employees Burgess, Stewart, Davis, and Wooten on October 12, 1990; and (3) refusing to hire employees Cason, McCutcheon, Skipper, Wood, Beattie, Stewart, Davis, and Burgess at the Hickory Hollow site. The Board's order therefore requires the Company to cease and desist from the violative practices and to offer employment at the Hickory Hollow job to the eight employees it refused to hire there if that job has not been completed. The order also requires the Company to make whole the employees it laid off or refused to hire, and to post at jobsites and mail to employees copies of a remedial notice.
 
 II.
 
 8
 We employ the "substantial evidence" standard in reviewing the Board's factual findings and its application of law to the facts. 29 U.S.C. Sec. 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); NLRB v. Aquatech, Inc., 926 F.2d 538, 544 (6th Cir.1991) (Section 8(a)(3) & (1) case); NLRB v. Okun Bros. Shoe Store, 825 F.2d 102, 105 (6th Cir.1987) (Section 8(a)(1) case), cert. denied, 485 U.S. 935 (1988). "Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision." Aquatech, 926 F.2d at 544 (internal quotations omitted). It is the Board's function to resolve fact and credibility questions, and this court ordinarily will not disturb those findings unless they are unreasonable. Id.
 
 A.
 
 9
 The Company challenges the Board's conclusions regarding the Sec. 8(a)(1) violations. Section 8(a)(1) of the Act implements the employees' right to self-organization under section 7 by making it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed them in section 157 of this title." 29 U.S.C. Sec. 158(a)(1). In determining, whether an employer has violated Sec. 8(a)(1), the test is whether the employer's conduct tends to coerce employees or tends to interfere with the employees' exercise of their rights. Okun Bros., 825 F.2d at 105. The Company complains of each of the Sec. 8(a)(1) violations found by the Board.
 
 
 10
 First, the Company challenges the Board's reliance on Davis' testimony concerning a conversation with foreman Taylor in July 1990. Davis testified that foreman Taylor told him (Davis) that he (Taylor) would hire Davis for the Green Hills job because he had dropped out of the Union, and that superintendent McBrayer had said that Davis' nonunion status was good because McBrayer did not want to have trouble later on if he got too many more union people on the job. The Company claims that Davis's testimony does not constitute substantial evidence because it is "unreliable hearsay within hearsay."
 
 
 11
 We agree. Section 160(b) of the Act requires that hearings before an ALJ shall, "so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States...." 29 U.S.C. Sec. 160(b); NLRB v. Sherwood Trucking Co., 775 F.2d 744, 750 (6th Cir.1985). Although we recognize that the rules of evidence are not inflexibly imposed in such proceedings, NLRB v. Maywood Do-Nut Co., Inc., 659 F.2d 108, 110 (9th Cir.1981), we think the neglect of hearsay rules here renders the evidence unreliable and therefore insubstantial.
 
 
 12
 The Company also takes issue with the Board's reliance on Burgess' testimony that on November 12, 1990, McBrayer told him (Burgess) that his union activities would hurt the employment of employees who were union sympathizers. Although Burgess' testimony about what McBrayer said arguably qualifies as a nonhearsay statement by a party-opponent under Fed.R.Evid. 801(d)(2)(D), we think that McBrayer's statements are most accurately characterized as a personal opinion and do not provide evidence of a Sec. 8(a)(1) violation. In this regard we note that the Board specifically rejected the ALJ's conclusions that similar statements made by McBrayer on October 10 and 12, 1990, were unlawful, and concluded that absent some direct reference to disloyalty, McBrayer's statements were merely expressions of purely personal opinions. See Decision and Order of the Board at 1-2. See also Roper Corp. v. NLRB, 712 F.2d 306, 311 (7th Cir.1983) (employer's statement to employees that they had "blown a beautiful deal" when they voted in favor of the Union was protected speech, and did not violate Sec. 8(a)(1) of the Act because it was not a threat or a promise and therefore not coercive). We therefore conclude that that Burgess's testimony here fails to constitute "substantial evidence" of a Sec. 8(a)(1) violation.
 
 
 13
 Next, the Company challenges the Board's conclusion that the Company unlawfully interfered with the employees' section 7 rights when foreman Taylor told employee Stewart, when Stewart was passing out Union T-shirts before the start of the work day, not to pass out Union T-shirts and caps "on company time." It is well-settled that although an employer may prohibit union solicitation during working hours, it may not prevent such activity outside of working hours, even if on company property. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 803-04 n. 10 (1945); Union Carbide Corp. v. NLRB, 714 F.2d 657, 663 (6th Cir.1983); NLRB v. Daylin, Inc., 496 F.2d 484, 487 (6th Cir.1974).
 
 
 14
 The Board's conclusion is not supported by Stewart's actual testimony. When asked what Taylor said to him on the morning in question, Stewart replied: "He said not to be doing that on company time, and I assured him that I wasn't, that we would be through before 7:00, and he said that was fine." (J.A. at 508-09.) It is clear from the context of their discussion, that Taylor was indicating, and Stewart understood, that "company time" meant actual working time, and did not include the period before the working day began. In short, the evidence relied on by the Board does not support its conclusion that the statement was coercive.
 
 B.
 
 15
 The Company also challenges the Board's rulings regarding Secs. 8(a)(3) and (1) of the Act, which proscribe employers from discriminating in the hiring or tenure of employment to discourage membership in any labor organization. 29 U.S.C. Secs. 158(a)(3) & (1).[3] Prohibited conduct includes laying off employees because of their union activities, Birch Run Welding & Fabricating, Inc. v. NLRB, 761 F.2d 1175, 1180 (6th Cir.1985), and refusing to hire job applicants because of their prior union activity. Methodist Hosp. of Ky., Inc. v. NLRB, 619 F.2d 563, 571 (6th Cir.) (citing Phelps-Dodge Corp. v. NLRB, 313 U.S. 177, 184-85 (1941)), cert. denied, 449 U.S. 889 (1980).
 
 
 16
 To make out a prima facie case of a Sec. 8(a)(3) violation, the General Counsel must prove that union animus motivated or contributed to the adverse employment decision. NLRB v. Vemco, Inc., 989 F.2d 1468, 1476-77 (6th Cir.), amended 997 F.2d 1149 (6th Cir.1993); Birch Run, 761 F.2d at 1179. Once the General counsel establishes a prima facie case, the burden shifts to the employer to show by a preponderance of the evidence that it would have made the same decision regardless of the protected activity. Vemco, 989 F.2d at 1479. Employer motivation is a fact question, and may be discerned from all the circumstances. Birch Run, 761 F.2d at 1179.
 
 
 17
 The Company challenges the Board's conclusion that the lay off of employees Burgess and Smith on October 9, 1990, was in retaliation for the employees' conduct in distributing Union hats and T-shirts. On the morning of October 8, 1990, Burgess solicited orders for Union T-shirts and caps at the "gang box." Later that afternoon, the Company imposed a one-day lay off on Burgess and his helper, Ralph Smith. Foreman Taylor told the men that the materials necessary to complete the job had failed to arrive. The Board credited the testimony of Burgess and Cason, who testified that the employees had all the materials they needed for the job they were performing, and that some of the work had been performed during their one-day absence, and cited statements by McBrayer concerning his disappointment in Burgess' and Stewart's union activities in concluding that the lay off violated Sec. 8(a)(3) and (1).
 
 
 18
 As pointed out by the Company, reliance on Burgess' testimony is inappropriate here, because Burgess testified that another employee, Bill Wooten, not Smith, was his helper that day. The only evidence in support of the Board's conclusion is derived from Cason's testimony that he thought Wooten was his partner that day, which we find to be insubstantial because Smith, the most appropriate person to testify as to whether he was Burgess's partner on October 9, was never called to testify. See Golden State Bottling Co., Inc. v. NLRB, 414 U.S. 168, 174 (1973). Additionally, there is no other evidence from which to infer union animus, the Board having dismissed the complaint regarding McBrayer's statements about Burgess' and Stewart's union activities. Further, the record reflects that the Company paid both Wooten and Burgess for a full forty-hour week during the week ending October 19, 1990. Finally, there is nothing in the record to show that Taylor harbored an ill-will towards the Union, other than the timing of the lay off in relation the Union activity, which is undermined by the fact that Taylor himself ordered a Union cap and T-shirt that very morning from Stewart. Because we can find no evidence of union animus surrounding the one-day lay off, the Board's order cannot be enforced in this regard.
 
 
 19
 The Company also disagrees with the Board's finding that the Company's October 12 permanent lay offs of Burgess, Stewart, Davis and Wooten was motivated by antiunion sentiments, which the Company asserts were part of a downsizing as the job wound down and working space became smaller. The Union claims that the four employees were laid off because of their Union activities. It counters with evidence of dramatically increased payroll hours and expenses after the October 12 lay offs, and the fact that the job was still not finished at the preordained time.
 
 
 20
 Contrary to the superficial appeal of the Union's evidence, we note that the large increase in overtime did not occur until the month after the lay offs, which belies the Union's assertion that the four employees were targeted for illegitimate reasons. This squares with the Company's characterization of the vicissitudes of a construction project, which is subject to unpredictable material deliveries and the concomitant difficulty in projecting future labor requirements.
 
 
 21
 Finally, the Company takes issue with the Board's rulings that the Company's failure to hire eight former Green Hills employees at the Hickory Hollow site was an unfair labor practice. Our difficulty with this conclusion is that we cannot find any evidence of union animus on the part of Traylor. Even if we factor in McBrayer's alleged statements concerning future jobs with the Company to Green Hills employees, there is simply no proof that McBrayer had any say or influence in Traylor's hiring decisions. Indeed, the record reflects that Traylor had hiring authority independent of McBrayer's, as borne out by the fact that Taylor and Morgan, both foremen at Green Hills, had to apply for work at Hickory Hollow, to be hired as carpenters.
 
 
 22
 The overarching problem in the Union's position is the utter failure of proof of union animus separate and distinct from the purported adverse employment action. The only evidence of union animus that has not been discredited by either the Board or this court are the various employment decisions themselves. However, the Union cannot bootstrap its way into a prima facie case in this manner. As already discussed, the Board rejected the ALJ's conclusions regarding the October 10 and 12 statements by McBrayer of alleged union animus, and we declined to draw an adverse inference regarding similar statements made by McBrayer on November 12, 1990. Nor do we think that statements made by Company president Jack Boler in a different case in a different state in the context of a firing of one employee are credible evidence of union animus in this case. Thus, having failed to make out a prima facie case of Secs. 8(a)(3) and (1) violations, this action is properly dismissed without further consideration of the Company's proffered reasons for its employment decisions.
 
 III.
 
 23
 In sum, we have carefully reviewed the entire record, most notably the transcript of the proceedings before the administrative law judge, in light of the Company's objections, and hold that the Board's order is not supported by substantial evidence. Enforcement of the Board's order therefore is DENIED.
 
 
 
 [1]
 It should be noted that the regional director determined in its October 18, 1990 Decision and Order that "Johnny Morgan" and "Lenny Taylor" were working foremen, and not supervisors within the meaning of the Act. Morgan and Taylor were therefore included in the bargaining unit found appropriate. This determination has significance in the present case insofar as the administrative law judge honored the finding and its ramifications on the evidentiary significance of statements made by the two foremen, which are considered to be representations not of management, but of a fellow employee. See Montgomery Ward & Co., 115 N.L.R.B. 645, 647 (1956), enf'd, 242 F.2d 497 (2d Cir.), cert. denied, 355 U.S. 829 (1957). The Board found that the holding in Montgomery Ward was immaterial to supervisor Taylor's remarks to Davis in July 1990, however, because the union-represented bargaining unit was not yet in existence, and there was no evidence in the record to show that the Union had taken any position as to Taylor's inclusion in the unit specified. In any event, the Company does not challenge the Board's ruling on this score
 
 
 [2]
 On November 14, 1990, the day before the election, the Board granted the Company's request for review of the regional director's decision. As a result, the ballots cast in the November 15 election were impounded
 
 
 [3]
 A violation of Sec. 8(a)(3) automatically violates Sec. 8(a)(1). See NLRB v. Vemco, Inc., 989 F.2d 1468, 1476-77 (6th Cir.), amended 997 F.2d 1149 (6th Cir.1993)